IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD O. SUTTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 07-569-GMS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

### I. INTRODUCTION

On September 20, 2007, plaintiff Ronald O. Sutton ("Sutton") filed this appeal from the ALJ's decision denying his claim for Social Security disability benefits.[1] (D.I. 1.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 10, 13.) For the reasons that follow, the court will: (1) grant in part and deny in part the plaintiff's motion for summary judgment, (2) deny the defendant's cross-motion for summary judgment, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ for further proceedings.

### II. BACKGROUND

On June 7, 2004, Sutton applied for Social Security disability benefits, claiming that he was disabled and unable to work due to "lumbar disc herniations that cause constant pain."[2] (D.I.

---

[1] Administrative Law Judge Clay G. Guthridge (the "ALJ") issued a written decision denying the plaintiff's claim for disability benefits on November 29, 2005 (the "ALJ's decision"). (D.I. 7 at 18-28.)

[2] Sutton was 44 years old when he originally filed his claim for disability benefits. (D.I. 11 at 4.) He was born on September 19, 1958, and graduated from high school in 1979. (*Id.*) From 1981 to 2002, Sutton worked as an industrial factory worker for National Vulcanized Fiber Co. ("NVF"). (*Id.*)

11 at 2.) Specifically, Sutton claimed that he "hurt his back at work in August 2002, and [then] again [later] in 2002," and that he required "physical therapy, medication, and a series of injections" to treat his condition. (D.I. 7 at 23.) Following the Social Security Administration's ("SSA") denial of his claim, both initially and upon reconsideration, Sutton requested a hearing before the ALJ. (*Id.* at 21.) Pursuant to that request, on October 14, 2005, the ALJ held a hearing on Sutton's claim. (*Id.*) At the hearing, Sutton testified that his "impairments cause pain that severely restricts his ability to stand, walk, sit, lift and carry, and engage in other basic work activities."[3] (*Id.* at 25.) In addition to Sutton's testimony, the ALJ also heard testimony from an impartial vocational expert, Mina A. Schwartz (the "vocational expert"), regarding Sutton's claim for benefits. (D.I. 7 at 21.)

Thereafter, on November 29, 2005, the ALJ issued a written decision denying Sutton's claim for benefits. (D.I. 7 at 21.) The ALJ concluded that Sutton was not "under a disability within the meaning of the Social Security Act" and, therefore, not entitled to disability benefits. (*Id.*) Consequently, on December 30, 2005, Sutton sought a review of the ALJ's decision by the Social Security Appeals Council. (*Id.* at 17.) The appeals council, however, ultimately denied Sutton's request for review on July 26, 2007. (*Id.* at 6.) On September 20, 2007, Sutton filed the instant appeal in this court. (D.I. 1.)

### A. Medical Evidence

Between August 2002 and July 2005, Sutton consulted a number of physicians and specialists regarding his condition. The court summarizes the relevant medical evidence of

---

[3] At the hearing, Sutton was represented by his attorney, Jennifer Donahue, Esq. (D.I. 7 at 21.)

record in this case as follows.

### 1.   *Henry Trostle, M.D. - The Occupational Health Center*

Dr. Henry Trostle ("Dr. Trostle") treated Sutton from August 2002 to September 2003. (D.I. 7 at 324-379.) Dr. Trostle diagnosed Sutton with back strain and sprain. (*Id.* at 332.) On December 17, 2002, Dr. Trostle restricted Sutton from working until January 9, 2003 due to Sutton's "severe pain" and the need for "sedating medications" to treat his condition. (*Id.* at 367-69.) On December 19, 2002, Dr. Trostle ordered a MRI of the lumbar spine. (*Id.* at 344.) The MRI results showed "marked degenerative disc disease at L5-S1 where there was marked bilateral foraminal stenosis and moderate central canal stenosis due to a bulging disc, broad based central and right paracentral disc herniation and facet degeneration." (D.I. 7 at 117.) These results also showed "foraminal stenosis at L2-3, L3-4, and L4-5, as well as some degree of central canal stenosis at L4-5 secondary due to bulging discs and facet degeneration." (*Id.*) On January 9, 2003, Dr. Trostle released Sutton to return to work on "modified duty" with restrictions to sit and stand as tolerated. (*Id.* at 370.)

### 2.   *Chester Simmons, Jr., M.D. - Chester County Orthopaedic Associates, Ltd.*

Dr. Chester Simmons, Jr. ("Dr. Simmons") treated Sutton from January 2, 2003 to August 21, 2003 for complaints of lower back pain radiating toward the groin and thigh. (D.I. 7 at 296.) Dr. Simmons diagnosed Sutton with lumbar strain and "degenerative spondylosis." (*Id.*) Dr. Simmons observed a "moderate restriction of lumbar motion with mild lumbar tenderness." (*Id.*) Dr. Simmons also observed that: (1) Sutton could "walk normally"; (2) Sutton's hip rotation was "painless"; (3) the results from Sutton's straight leg raising tests were "negative";

and that (4) Sutton retained normal strength, sensation, and reflexes in his lower extremities. (*Id.* at 298-304.)

After reviewing Sutton's MRI, Dr. Simmons noted that: (1) he did not see any significant nerve impingement; (2) Sutton's whole body bone scan was "normal"; (3) a urogenital cause for Sutton's groin could be ruled out; and that (4) Sutton's pelvic MRI did not demonstrate an obvious intrapelvic mass. (D.I. 7 at 296-303.) In addition, Dr. Simmons recommended that Sutton seek a "second opinion from [a] tertiary spine centre or pain management clinic." (*Id.* at 303.) At Sutton's final visit on August 21, 2003, Dr. Simmons released Sutton to return to work in a "lighter duty" capacity with the following restrictions: (1) no frequent bending, twisting, or reaching; (2) lift or carry only up to 10 pounds; (3) alternate sitting and standing as needed for comfort; (4) kneel, crawl, squat, or climb as tolerated; and (5) no work around hazardous equipment. (*Id.* at 308.)

### 3. *Stephen M. Beneck, M.D. - Delaware Back Pain & Sports Evaluation Center*

Dr. Stephen Beneck ("Dr. Beneck") began treating Sutton for chronic low back pain on August 13, 2003. (D.I. 7 at 226.) Based on Sutton's initial exam, Dr. Beneck diagnosed Sutton with chronic lower back pain due to a "central paracentral disc herniation." (*Id.* at 227-28.) Dr. Beneck recommended that Sutton try epidural steroid injections to decrease his pain and that he return to work in "some modified-duty capacity." (*Id.* at 228.) On November 21, 2003, following two epidural steroid injections, and two nerve root blocks, Sutton consulted once again with Dr. Beneck. (*Id.* at 200.) At that time, Dr. Beneck noted that Sutton "continues with a great deal of back pain . . . due to his degenerative disc disease at L5-S1." (D.I. 7 at 201.) In addition,

Dr. Beneck recommended that Sutton see a physical therapist. (*Id.*) Dr. Beneck also noted that, although Sutton could not perform his regular job, Sutton could perform light duty work. (*Id.*)

In a follow up visit with Dr. Beneck on January 30, 2004, Sutton reported that physical therapy helped his mobility, but that it did not help his pain. (D.I. 7 at 195) Dr. Beneck noted that Sutton continues to have "chronic back pain due to severe lumbar degenerative disc disease" and that Sutton "remains disabled from his regular duty job and can only work a sedentary type job." (*Id.* at 191-92.) On March 30, 2004, during another visit, Dr. Beneck noted that Sutton "continues to do poorly, with respect to his low back." (*Id.* at 189.) Dr. Beneck also noted that Sutton was "stretching for exercise, on a daily basis" and doing "some walking for exercise," but that "he cannot walk for more than about 15-minutes, because of pain." (*Id.*) Dr. Beneck further noted that: (1) Sutton's "lumbar range of motion was limited"; (2) Sutton "continues with chronic back pain, due to severe lumbar degeneration at the L5-S1 level"; and that (3) Sutton "remains disabled from his regular-duty job." (D.I. 7 at 190.) Also during this visit, Dr. Beneck and Sutton discussed the option of surgery. (*Id.*) Based on that discussion, Dr. Beneck referred Sutton to a neurosurgeon to further discuss and consider a "surgical option." (*Id.*)

On April 26, 2005, Sutton returned to Dr. Beneck for another follow up visit. (D.I. 7 at 268.) During that visit, Sutton reported that he decided not to have back surgery. (*Id.* at 268.) Based on his assessment of Sutton at that time, Dr. Beneck recommended that Sutton continue "walking and exercising to some extent on a daily basis." (*Id.*) Dr. Beneck also prescribed Sutton medication to treat his "significant reactive depression." (*Id.*)

On July 1, 2005, Dr. Beneck completed a "Lumbar Spine Residual Functional Capacity Questionnaire" (the "RFC Questionnaire") diagnosing Sutton with degenerative disc disease of

5

the lumbosacral spine and low back pain. (D.I. 7 at 243.) In addition, Dr. Beneck described Sutton's prognosis as "poor." (*Id.*) In support of this opinion, Dr. Beneck noted the positive discogram at L4-5 and L5-S1, as well as Sutton's MRI results. (*Id.*) Dr. Beneck also made the following observations in further describing Sutton's condition: (1) reduced range of motion; (2) abnormal gait; (3) tenderness; (4) muscle spasm; (5) impaired sleep; and (6) lumbar range of motion limited in all planes. (D.I. 7 at 244.) Regarding Sutton's functional limitations, Dr. Beneck concluded that Sutton was able to sit for only about two hours, and stand and walk less than two hours in an eight-hour work-day. (*Id.* at 245.) In addition, Dr. Beneck concluded that Sutton: (1) will require unscheduled, five-minute breaks during an eight-hour workday about every thirty to forty-five minutes; (2) should rarely lift less than ten pounds; (3) should never crouch, squat, climb ladders, twist, stoop or climb stairs; and that Sutton (4) would likely be absent from work more than four days per month. (*Id.* at 246.)

### 4. *Ginger Chiang, M.D. - Delaware Back Pain & Sports Evaluation Center*

Sutton initially consulted Dr. Ginger Chiang ("Dr. Chiang") on August 22, 2003. (D.I. 7 at 222.) During that initial visit, Dr. Chiang diagnosed Sutton as having lumbar disc herniation and spinal stenosis. (*Id.*) As a result, Dr. Chiang recommended that Sutton undergo an epidural steroid injection, which Sutton underwent on August 28, 2003. (*Id.*) Following that visit, Sutton underwent a series of subsequent epidural steroid injections on September 9, 2003, September 25, 2003 and October 13, 2003. (*Id.*)

### 5. *Alan S. Hilibrand, M.D. - Rothman Institute of Orthopaedics*

On June 14, 2004, Dr. Alan Hilibrand ("Dr. Hilibrand") examined Sutton on a referral

from Dr. Beneck. (D.I. 7 at 149-51, 309-11.) Dr. Hilibrand diagnosed Sutton as having "right L5 radiculitis with axial discogenic pain at the 4-5-1 level" and "myofascial pain." (*Id.* at 313.) Dr. Hilibrand noted a limited range of extension in Sutton's back, but that Sutton retained full motor strength and had normal sensation and reflexes. (*Id.* at 150, 310.) Dr. Hilibrand also noted that there was no herniated disc or nerve compression, and that Sutton was able to "sit for an hour, stand for an hour and walk for two blocks." (*Id.* at 310, 313.) Dr. Hilibrand characterized Sutton's condition as "mechanical back pain." (D.I. 7 at 150.) Regarding further treatment of Sutton's condition, Dr. Hilibrand did not recommend surgery. (*Id.*)

6. *Pawan Rastogi, M.D. - Neurosurgery Associates, P.A.*

Dr. Pawan Rastogi ("Dr. Rastogi"), a neurosurgeon, initially examined Sutton on December 8, 2004. (D.I. 7 at 250.) During that initial exam, Dr. Rostagi noted that Sutton had "significant mechanical low back pain," and that Sutton's MRI showed "significant degenerative disease with a disc protrusion at L5-S1." (*Id.* at 253.) Dr. Rostagi also noted that Sutton "failed to improve with conservative management," and that Sutton's "options include just living with his pain and continuing exercises and medications." (*Id.*) As a follow up to that initial visit, Dr. Rastogi examined Sutton again on March 22, 2005. (*Id.* at 254.) During that follow up exam, Dr. Rastogi noted that Sutton's "pain has been fairly significant despite the full gambit of conservative therapy," and that Sutton "shows disease that is quite diffuse." (D.I. 7 at 254.) Moreover, Dr. Rastogi found that Sutton had "an annular tear at L4-5 as well as a collapsed disc at L5-S1." (*Id.*) Dr. Rastogi also found that Sutton's MRI showed "pretty normal L4-5 and L3-4 discs," and that Sutton's discogram morphology was "not too bad." (*Id.*) Based on his overall assessment, Dr. Rastogi recommended that Sutton consider having a possible "L5-S1 fusion"

surgery as a way to relieve some of his symptoms. (*Id.*)

### 7. *Vinod Katoria, M.D. and John Kramer, M.D. - State Agency Physicians*

On August 19, 2004, Dr. Vinod Katoria ("Dr. Katoria"), a state agency physician, reviewed the medical evidence of record and opined that Sutton could perform light exertional work that: (1) requires no more than an occasional climbing, stooping, kneeling, crouching, and crawling, and that (2) allows him to avoid concentrated exposure to hazardous machinery. (D.I. 7 at 175-82.) On December 13, 2004, John Kramer, M.D. ("Dr. Kramer"), a second state agency physician, reviewed the medical evidence of record and opined that Sutton could perform light exertional work that: (1) requires no more than occasional postural maneuvers, (2) allows him to avoid concentrated exposure to extreme cold and vibrations, and that (3) allows him to avoid even moderate exposure to hazards. (*Id.* at 233-42.) In assessing Sutton's condition, Dr. Kramer further noted that: (1) Sutton's "physical findings are impressive for mechanical back pain," (2) Sutton "is a poor candidate for any disc surgery, but not responsive to conservative [treatment] measure[s], *e.g.*, physical therapy, medications, and epidurals," (3) Sutton's "[c]redibility seems good," and that (4) Sutton "is severely compromised but not a good candidate for definitive surgical procedure." (*Id.* at 238, 240.)

### 8. *Physical Therapy - The Center for Physical Rehabilitation & Sports Medicine and Delaware Curative Workshop*

From August 23, 2002 to November 6, 2003, Sutton attended physical therapy at the Center for Physical Rehabilitation & Sports Medicine. (D.I. 7 at 273-94.) At his last visit, on November 6, 2003, Sutton's physical therapist reported "no real change" in Sutton's symptoms, and that Sutton was experiencing difficulty sleeping and doing household chores. (*Id.* at 294.) In

addition, from April 14, 2003 to August 16, 2004, Sutton also attended physical therapy at the Delaware Curative Workshop (*Id.* at 119-74.) In a physical therapy progress note dated July 27, 2004, Sutton's physical therapist noted that, after 12 physical therapy sessions, Sutton was "showing a slow response to manual therapy as well as to stretching." (*Id.* at 127.)

### 9. *Disability Adjudicator Review - Delaware Disability Determination Services Unit*

On December 1, 2004, a disability adjudicator from the Delaware Disability Determination Services Unit reviewed Sutton's file.[4] (D.I. 7 at 241-42.) After reviewing Sutton's medical records, the disability adjudicator noted that Sutton had "excellent compliance" with treatment recommendations, and that Sutton was "credible." (*Id.* at 242.) Based on the DDS' review of the record medical evidence, as well as Sutton's pain level, the disability adjudicator concluded that Sutton was physically limited to: (1) standing or walking two hours in an eight-hour workday and to (2) sitting no more than six hours. (*Id.*)

### B. **Hearing Testimony**

#### 1. *Sutton's Testimony*

At the October 14, 2005 hearing before the ALJ, Sutton testified about his background, the nature of his disability, and his claim for disability benefits. (D.I. 7 at 390-433.) Specifically,

---

[4] The Delaware Disability Determination Services Unit ("DDS") is a state administered federal program that serves Delawareans who are unable to work because of a disability. DDS is a state agency that is governed by the Social Security Administration and 100% federally funded. DDS develops, adjudicates, and processes disability claims of residents for Social Security disability benefits. DDS's disability adjudicators determine: (1) whether a person meets the statutory definition of a disability as defined in the Social Security Act and (2) whether the disabled individual meets medical eligibility to receive Social Security Disability Insurance (SSDI) or Supplemental Security Income (SSI). *See generally* www.delawareworks.com/dvr/services/dds.shtml.

Sutton discussed his past employment, including his previous jobs as a press operator, utility man, and treater operator. (*Id.* at 402-07.) In addition, Sutton explained that he injured his back in August 2002, while lifting heavy carts of tubes at work. (*Id.* at 409.) Sutton further explained that, between August and December 2002, he attempted to return to work multiple times, but was unsuccessful due to his ongoing back pain. (*Id.* at 410.)

In addition to his past employment and the nature of his disability, Sutton also testified about the course and extent of his medical treatment. (D.I. 7 at 411.) Specifically, Sutton stated that he had undergone four epidural injections, taken pain medications, and engaged in physical therapy; but that none of these treatment options provided him any relief. (*Id.* at 411-14.) Sutton further reported that his physicians advised him that surgery would likely not alleviate his back pain. (*Id.* at 412.) In addition, Sutton described his ailments and limitations in detail, including the pain and muscle spasms he experiences in his back, right leg, groin, and inner thigh area. (*Id.* at 414-15, 418, 425.) Sutton also described the functional limitations resulting from his condition. (D.I. 7 at 415.) In particular, Sutton stated that he experiences pain after walking ten to thirty minutes, and that he is only able to stand for twenty to thirty minutes. (*Id.* at 415-16.) Sutton stated that he is only able to sit for twenty to thirty minutes, and that he has difficulty going up and down stairs. (*Id.* at 417-19.) Sutton further stated that he is able to lift ten pounds, but that reaching causes tightness in the right side of his back. (*Id.* at 418, 426.)

In describing his daily activities, Sutton testified that when he wakes up, he brushes his teeth and walks for about an hour to relax his muscles. (D.I. 7 at 420.) He further testified that, during the day, he watches television and does crossword puzzles, but that he does very little chores. (*Id.* at 421-23.) In addition, Sutton noted that driving irritates his right leg, and that

tying his shoe, and putting on pants are difficult. (*Id.* at 427.)

### 2. *The Vocational Expert's Testimony*

At the same hearing before the ALJ, the vocational expert offered testimony regarding Sutton's background, skills and limitations, and the number of jobs that exist in the national economy that a person of Sutton's age, education, and skills may perform. Specifically, the vocational expert testified that the exertion and skill level of Sutton's work prior to his injury ranged from semiskilled to skilled. (D.I. 7 at 428.) In addition, the vocational expert noted that the type of work Sutton previously performed is industry-specific, and not transferable to other areas of work. (*Id.* at 412.) The vocational expert noted that a hypothetical person with Sutton's residual functioning capacity would not be able to perform Sutton's prior work and would require work at a sedentary level. (*Id.* at 412.) According to the vocational expert, given Sutton's functional limitations, and his lack of work experience in a clerical or professional capacity, there are not many jobs in the regional or U.S. economy suitable for a hypothetical individual with those limitations. (*Id.* at 430-31.) Nonetheless, the vocational expert claimed that there are 25,000 security job monitor positions nationwide that "might be suitable" for a hypothetical individual with Sutton's limitations. (D.I. 7 at 431.)

### C. The ALJ's Findings

The ALJ concluded that Sutton was not "under a disability within the meaning of the Social Security Act" and thus, not entitled to disability benefits.[5] (D.I. 7 at 21.) Specifically, on November 9, 2005, the ALJ issued the following findings:

---

[5] In rendering this decision, the ALJ employed the five-step process mandated by 20 C.F.R. §§ 404.1520 and 415.920. *See, e.g., Brewster v. Heckler*, 786 F.2d 581, 583-84 (3d Cir. 1986).

11

1. The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act through June 30, 2008.

2. The claimant has not engaged in substantial gainful activity since December 19, 2002 (20 C.F.R. § 404.1520(b)).

3. The claimant has the following severe impairment: lumbar spinal disorder (20 C.F.R. § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4 (20 C.F.R. § 404.1520(d)).

5. Upon careful consideration of the entire record [the ALJ] finds that the claimant has the residual functional capacity to perform sedentary exertional work, with a sit or stand option every 30 minutes, occasional postural activities with no climbing ladders, ropes, scaffolding, and avoiding concentrated cold, vibrations, heights, and hazards.

6. The claimant is unable to perform any of her past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on September 19, 1958, and was 44 years old on the alleged disability onset date, which is defined as a younger individual between age 18-44 (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 C.F.R. § 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560 and 404.1566).

11. The claimant has not been under a "disability" as defined in the Social Security Act from December 19, 2002, through the date of this decision (20 C.F.R. § 404.1520(g)).

(D.I. 7 at 23-28.)

### III. PARTIES' CONTENTIONS

In this appeal, Sutton contends that the ALJ's decision should be reversed because it is not supported by substantial evidence in the record. (D.I. 11 at 1.) Specifically, Sutton argues that the ALJ erred as a matter of law by: (1) "failing to accord adequate weight to the opinions and assessments" of Sutton's treating physician; (2) by failing to provide "specific rationale" for rejecting Sutton's testimony; and (3) by failing to establish that there, in fact, exists "other work in the national economy" that Sutton can perform. (*Id.* at 14, 21, 24.)

The defendant, on the other hand, contends that the ALJ's decision is supported by substantial evidence in the record and should, therefore, be affirmed. (D.I. 14 at 24.) Specifically, the defendant argues that: (1) the "ALJ correctly weighed the medical opinion evidence of record," including that of Sutton's treating physician; (2) the ALJ correctly found that Sutton's testimony was "not credible"; and that (3) substantial evidence in the record supports the ALJ's finding that Sutton "could perform alternative work which exists in significant numbers in the economy." (*Id.* at 3.)

### IV. STANDARD OF REVIEW

#### A. <u>Summary Judgment</u>

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (D.I. 10, 13.) In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refrain from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation

omitted). If the court is able to determine that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

### B. Review of the ALJ's Findings

The court must uphold the ALJ's factual findings if they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is not a "large or a considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (internal citation omitted). *See also Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (defining substantial evidence as "more than a mere scintilla") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Credibility determinations are, likewise, the province of the ALJ, and should be disturbed on review only if not supported by substantial evidence. *See Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the ALJ's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

In the context of Social Security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988). In addition, the Third Circuit instructs that the ALJ's decision, read as a whole, must illustrate "that the ALJ considered the appropriate factors in reaching the conclusion." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ, however, is not required to discuss the record evidence in each section of

his decision. *Id.* at 504-05.

## V. DISCUSSION

After having considered the record in this case, the parties' submissions and arguments, and the applicable law, the court concludes that the ALJ's decision is not supported by substantial evidence in the record. Specifically, the court finds that the ALJ failed to accord proper weight to the medical opinions of Sutton's treating physician. The court will, therefore, (1) grant in part and deny in part the plaintiff's motion for summary judgment, (2) deny the defendant's cross-motion for summary judgment, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ for further proceedings.[6]

In determining the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson*, 402 U.S. at 399. In particular, regarding the weight given to a treating physician's medical opinion, the Third Circuit requires that "treating physicians' . . . be accorded great weight, especially 'when their opinions reflect expert judgment based on continuing observations of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir.1987)); *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason*, 994 F.2d at 1067. Indeed, a treating physician's

---

[6] Because this matter is being remanded due to the ALJ's failure to accord proper weight to the opinion of Sutton's treating physician, and on remand the ALJ may ultimately reach different conclusions regarding Sutton's condition, as well as the credibility of Sutton's testimony and Sutton's residual functional capacity, the court need not, at this point, address any of the other issues Sutton raises in this appeal.

opinion is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ, however, may reject a treating physician's opinion if it is based on "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp.2d 644, 660 (D. Del. 2008); *see also* Social Security Regulation ("S.S.R.") 96-2p, 1996 SSR LEXIS 9, at *4 (July 2, 1996) (noting that "a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight").

Here, the court finds that the ALJ failed to accord proper weight to the medical opinions and assessments of Sutton's treating physician, Dr. Beneck. Specifically, in rejecting Dr. Beneck's opinion, the ALJ found that Dr. Beneck's medical opinion is not supported by his treatment notes. (D.I. 7 at 26.) The ALJ found that Dr. Beneck's July 5, 2005 opinion regarding Sutton's degenerative disc disease and Sutton's limited residual functional capacity to be "contrary" in light of Dr. Beneck's earlier treatment notes indicating that Sutton could perform light duty or sedentary work. (*Id.*) These findings, however, are not supported by substantial evidence in the record.

First, the court is not convinced that Dr. Beneck's opinion contradicts the substantial evidence in the record. To the contrary, the record suggests otherwise. Indeed, over the course

16

of his two-year treating relationship with Sutton, Dr. Beneck's treatment notes consistently state that Sutton suffers from "chronic back pain due to severe lumbar degenerative disc disease," and that this condition adversely affects Sutton's daily activities and quality of life. (D.I. 7 at 190, 201, 227-28, 243.) Dr. Beneck's treatment notes also consistently indicate that Sutton suffers from a number of serious physical limitations, including, among other things, decreased range of motion in the lumbar spine and muscle spasms. (*Id.* at 244.) In addition, Dr. Beneck's treatment notes invariably state that Sutton is unable to perform his regular employment. (*Id.* at 191-92, 245-46.) Moreover, it is evident from Dr. Beneck's notes that, due to the severity of his condition, Sutton required the full battery of treatment options, including physical therapy, epidural injections, medications, and referrals to specialists in the field. It is also evident that, according to Dr. Beneck's notes, these treatment efforts have all proven unsuccessful. (*Id.* at 189.) In light of Dr. Beneck's notes, compiled over the course of Sutton's treatment, and the other objective medical evidence of record, the court is not persuaded that Dr. Beneck's opinion contradicts the substantial evidence in the record.

Second, the court is, likewise, not persuaded that the ALJ gave proper weight to the medical opinion and objective record evidence of Dr. Rastogi. Specifically, the record reflects that, after examining Sutton in 2004 and again in 2005, Dr. Rastogi diagnosed Sutton as having "significant mechanical low back pain" and "significant degenerative disease with a disc protrusion at L5-S1." (*Id.* at 253.) The ALJ, however, failed to state what, if any, weight he gave to the opinion of Dr. Rastogi. Despite the fact that Dr. Rastogi's diagnosis supports that of Dr. Beneck, the ALJ makes no mention of Dr. Rastogi's treatment records or his opinions in the November 29, 2005 decision denying Sutton's claim for benefits. The court is, therefore, left to

17

speculate as to what consideration or probative weight, if any, the ALJ afforded these relevant treatment records.

Third, the court is also not convinced that the ALJ gave adequate weight to any of the other objective medical evidence supporting Dr. Beneck's opinion. In particular, there are a number of diagnostic tests that support the severity of Sutton's condition, and that underlie the functional limitations Dr. Beneck identified. For example, a December 2002 MRI of Sutton's lumbar spine confirmed "degenerative disc disease." (D.I. 7 at 117.) Similarly, a September 2003 EMG of Sutton's lower extremities showed "left S1 radiculpathy." (*Id.* at 209.) In addition, an MRI of Sutton's lumbar spine taken in September 2004 also showed that Sutton's condition was "unchanged" since 2002. (*Id.* at 248-49.) In February 2005, both a discogram and a CT scan of Sutton's spine showed "concordant pain" and "advanced degenerative disease." (*Id.* at 258-59, 263-64.) . Indeed, all of these diagnostic test results are consistent with Dr. Beneck's July 5, 2005 opinion regarding the Sutton's chronic degenerative disc disease and Sutton's limited residual functional capacity . The ALJ, however, does not address this point in his decision. In fact, the ALJ cites no specific diagnostic test that actually contradicted Dr. Beneck's opinion. Furthermore, the ALJ makes no mention of what consideration, if any, he gave to the February 2005 discogram or the CT scan; even though these more recent tests would seemingly provide objective evidence, as well as an up-to-date indication as to the progression of Sutton's condition. The court is, therefore, uncertain as to whether the ALJ properly considered these records, or, if so, what probative weight the ALJ afforded them.

Because the ALJ failed to accord proper weight to medical opinions and assessments of Sutton's treating physician, the court concludes that the ALJ's decision is not supported by

substantial evidence in the record.

## VI. CONCLUSION

For the foregoing reasons, the court will, therefore, (1) grant in part and deny in part the plaintiff's motion for summary judgment, (2) deny the defendant's motion for summary judgment without prejudice, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ for further proceedings consistent with this memorandum opinion.

Dated: September 17, 2009

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD O. SUTTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 07-569-GMS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

For the reasons stated in the court's memorandum of this same date, IT IS HEREBY ORDERED that:

1. The plaintiff's motion for summary judgment (D.I. 10) is GRANTED IN PART and DENIED IN PART.

2. The defendant's motion for summary judgment (D.I. 13) is DENIED without prejudice.

3. The ALJ's November 29, 2005 decision is VACATED.

4. This matter be REMANDED for further proceedings.

Dated: September 17, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE